1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9                    FOR THE DISTRICT OF ARIZONA

10

11
     United States of America,           )    CR 11-03035-TUC-RCC(HCE)
12                                        )
             Plaintiff,                   )    **REPORT AND RECOMMENDATION**
13                                        )
     vs.                                  )
14                                        )
                                          )
15   Tiffany Nicole Wilson,               )
                                          )
16           Defendant.                   )
                                          )
17   _____     )

18
           Pending before the Court is Defendant's Motion To Suppress Evidence (Doc. 16). The
19
     Government filed a Response To Defendant's Motion To Suppress (Doc. 18). Defendant's
20
     motion came on for hearing on October 31, 2011. U.S. Border Patrol Agents (hereinafter
21
     "BPA") Juan Romero (hereinafter "Romero at p. _") and Christopher Magsamen (hereinafter
22
     "Magsamen at p. _") testified on behalf of the Government. Transcript of the October 31,
23
     2011 evidentiary hearing was ordered by the undersigned Magistrate Judge, filed on
24
     November 9, 2011 (Doc. 26), and is forwarded to the District Court for review. Marked and
25
     admitted into evidence were: (1) Government Exhibit 1: Photo of front view of 2002 Ford
26
     Focus; (2) Government Exhibit 2: Photo of rear view of 2002 Ford Focus; (3) Government
27
     Exhibit 3: Photo of open trunk of 2002 Ford Focus; (4) Government Exhibit 4: Copy of
28

1 Defendant's Business License Card; (5) Government Exhibit 5: Copy of Arizona ID Card

2 belonging to passenger in 2002 Ford Focus; and (6) Defendant's Exhibit 27: I-166c Form

3 authored by BPA Magsamen dated August 7, 2011.

4       After consideration of Defendant's Motion To Suppress Evidence (Doc. 16), the

5 Government's Response To Defendant's Motion To Suppress Evidence (Doc. 18),

6 testimony, and exhibits, the Magistrate Judge recommends that the District Court deny

7 Defendant's Motion To Suppress Evidence (Doc. 16).

8 **I. PROCEDURAL AND FACTUAL BACKGROUND**

9       **A.    Indictment**

10       Defendant is charged with knowingly and intentionally possessing with the intent to

11 distribute approximately 90 kilograms of marijuana, a Schedule I controlled substance, on

12 or about August 7, 2011, at or near Three Points, in the District of Arizona, in violation of

13 21 U.S.C. §§841(a)(1) and 841(b)(1)(C).  (Doc. 8).

14       **B.    Facts**

15       It is alleged that on August 7, 2011 at approximately 6:00 p.m., Defendant was driving

16 a 2002 Ford Focus east-bound on State Route 86 when she approached the Three Points

17 Border Patrol checkpoint located at milepost 146. (Romero at pp. 12-13). Defendant was

18 accompanied by her sister, Ms. Sade Raeshon Bruce.  (*Id.* at p. 24; Government's Exh.  5).

19 Defendant stopped at the checkpoint primary inspection. (*Id.* at p.14).The primary agent was

20 BPA Romero. ( *Id.*).

21       BPA Romero looked at Defendant and identified himself as a Border Patrol agent.

22 (*Id.*). BPA Romero asked Defendant and her sister whether they were U.S. citizens. (*Id.* at

23 pp. 14, 46). Defendant answered that they were U.S. citizens. (*Id.* at p. 14). BPA Romero

24 asked where were they going and Defendant answered that they were going home after

25 dropping their brother off in Sells, Arizona. (*Id.* at p. 16). BPA Romero asked Defendant "if

26

27

28

she was a T.O." to which Defendant responded: "Huh?" (*Id.* at pp. 16-17)[1]. BPA Romero stated *both* that he *was not* sufficiently satisfied that Defendant was a citizen *and* that he *was* satisfied that she was a citizen. (*Id.* at pp, 46-48, 51). BPA Romero opines that because Defendant appeared nervous[2] and "lacked knowledge of the tribe", he decided to continue an immigration inspection to ensure no one else was in the vehicle who was in the United States illegally. (*Id.* at pp. 18, 19).[3] Defendant was in primary inspection for approximately a minute. (*Id.* at p. 20). Defendant was directed to drive further east to secondary inspection. (*Id.* at pp. 20-21).

Once at secondary inspection, BPA Romero asked Defendant where was she coming from, to which she replied with more specificity that she had dropped her brother off at her mother's home. (*Id.* at p. 21). BPA Romero asked for an address which Defendant could not provide. (*Id.* at p. 22 ("[s]he couldn't give me an address...she just told very vague directions.")). BPA Romero thought Defendant was being untruthful. (*Id.*). BPA Romero asked Defendant who owned the 2002 Ford Focus, to which she replied that it belonged to her uncle and that she had borrowed it to drop off her brother. (*Id.*).

BPA Romero asked defendant for identification and observed Defendant go through

---

[1]BPA Romero acknowledges that Defendant appears to be African-American, knows of none living on the Tohono O'odham Indian Nation, knows of no circumstances where African-Americans are members of the Tohono O'odham Indian Nation and does not think Defendant's race was suspicious in any way. (Romero at p. 90).

[2]BPA Romero states Defendant's nervousness was evidenced by: (1) her rigid sitting posture; (2) both her hands on the steering wheel; (3) her avoidance of eye contact; and (4) her rapid speech, none of which singularly are suspicious. (Romero at pp. 17-18, 52-54). BPA Romero has seen people get tense at checkpoints where no contraband has been found. (*Id.* at p. 55).

[3]The 2002 Ford Focus driven by Defendant and ultimately found to contain 90 kilograms (198 lbs.) of marijuana did not appear to BPA Romero to be riding low, nor did he smell the odor of marijuana. (Romero at p. 56).

1  her wallet several times[4] and not finding it, informed BPA Romero that she must have left

2  it at home.  (*Id.* at p. 23). BPA Romero testified that after the aforesaid exchange with

3  Defendant at *secondary* inspection, he got BPA Magsamen's attention to get his canine

4  Lando. (*Id.* at p. 26). BPA Magsamen maintains that he was at "pre-primary", located west

5  of primary inspection, when BPA Romero, at *primary* inspection with Defendant, raised two

6  fingers signifying "secondary". (Magsamen at pp. 96-97). As BPAs Romero and Magsamen

7  walked to secondary inspection, BPA Romero stated to BPA Magsamen that the driver and

8  passenger were acting nervous, were not able to answer his basic questions, and neither was

9  the registered owner of the 2002 Ford Focus. (*Id.* at pp. 97-98). BPA Magsamen walked to

10  his vehicle located east of secondary to retrieve his canine, Lando. (*Id.* at pp. 94, 98-99).

11      Upon being taken out of BPA Magsamen's vehicle, Lando, "alerted" by exhibiting

12  a stiff posture with his head up, increased respiration, and "tracing odor" by moving his head

13  from side to side. (*Id.* at p. 99). Lando closed his mouth, breathed rapidly and began to

14  "draft"[5] towards the front of the 2002 Ford Focus. (*Id.* at p. 99). Lando then went around

15  BPA Romero on the driver's side, to the trunk area when he sat down.[6] (*Id.* at p. 100). BPA

16  Magsamen informed BPA Romero that Lando alerted. (*Id.*). Lando detected either drugs or

17  hidden individuals. (*Id.* at p. 100).[7]

18      BPA Romero testified that he asked Defendant if it was okay if he looked in the trunk

19  to which Defendant responded: "Yes, go ahead." (Romero at p. 30; Magsamen at p. 101).

20  Defendant handed BPA Romero the key at which time he noticed Defendant's hand was

21  shaking and she was breathing faster. (Romero at p. 31). BPA Romero asked Defendant to

22

23      [4]BPA Romero testified that Defendant skipped identification in the wallet that he
could see. The identification BPA Romero saw was that of the passenger. (Romero at p. 23).

24
        [5]"Drafting" means the canine pulls upon the restricting leash. (Magsamen at p. 100).
25

26      [6]BPA Magsamen testified that sitting is a "trained behavior that pinpoints the source."
(Magsamen, at p. 100).

27
        [7]BPA Magsamen does not know how it is that Lando can distinguish a concealed
28  person from a non-concealed person. (Magsamen at p. 120)

1  accompany him to the back of the vehicle. (*Id.*). Opening the trunk revealed eight marijuana

2  "bricks". (*Id.* at pp. 32-33). Defendant responded: "Hmm, what is that?", or, "Oh, what is

3  that?"as if she was surprised. (*Id.* at pp. 32, 75). BPA Romero did not believe Defendant was

4  surprised. (*Id.* at p.32). BPA Romero testified that no more than five minutes elapsed from

5  Defendant's arrival at secondary inspection to when she purportedly gave her consent to

6  search the vehicle. (*Id.* at p. 34).

7       BPA Romero handcuffed Defendant, and flexi-cuffed the passenger after asking her

8  to step out of the vehicle. (*Id.*) Defendant was advised of her rights pursuant to *Miranda*. (*Id.*)

9  Defendant was not asked any questions. (*Id.* at p. 67).

10  **II.  Analysis**

11       It is well-settled that "[r]outine searches of the persons and effects of entrants [at

12  international borders] are not subject to any requirement of reasonable suspicion, probable

13  cause, or warrant...."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)

14  (footnote omitted) (Executive Branch has "plenary authority" to conduct warrantless routine

15  searches to regulate "collection of duties and to prevent the introduction of contraband....");

16  *see also United States v. Flores-Montano*, 541 U.S. 149, 152 (2004)(government may search

17  vehicle entering international port because of "interest in preventing the entry of unwanted

18  persons and effects...."). However, detention beyond a routine stop does require reasonable

19  suspicion of wrongdoing. *United States v. Bennett*, 363 F.3d 947, 951-52 (9th Cir.

20  2004)(reasonable suspicion justified extended border search).

21       The aforesaid border search exception to the Fourth Amendment also applies to a

22  search conducted at the "functional equivalent" of a border. *United States v. Cardona*, 769

23  F.2d 625, 628 (9th Cir. 1985); *see also Almeida-Sanchez v. United States*, 413 U.S. 266, 272-

24  73 (1973).  An officer must first have a reasonable certainty based upon:

25          the totality of the facts and circumstances within the officers'
            knowledge and of which they have *reasonably trustworthy*
26          *information* [which must] be sufficient in *the light of their*
            *experience* to warrant a firm belief that a border crossing has
27          occurred.

28  *United States v. Guzman-Padilla*, 573 F.3d 865, 880 (2009)(*citing United States v. Tilton*,

1 534 F.2d 1363, 1366-67 (9th Cir. 1976)) (emphasis added). Agents need not have actually

2 observed a vehicle cross the border in order to be reasonably certain that it did. *United States*

3 *v. Dobson*, 781 F.2d 1374, 1376 (9th Cir. 1986). Moreover, "[a] vehicle may be stopped at

4 permanent immigration checkpoints for brief initial questioning and referred to a secondary

5 inspection area for further questioning 'in the absence of any individualized suspicion.'"

6 *United States v. Wilson,* 7 F.3d 828, 833 (9th Cir. 1993) (*quoting United States v. Martinez*

7 *Fuerte,* 428 U.S. 543, 562 (1976)). Additionally, the Ninth Circuit has "held...that a stop

8 conducted at a clearly visible temporary checkpoint pursuant to a routine inspection of all

9 vehicles for illegal aliens is not unreasonable under the Fourth Amendment." *United States*

10 *v. Soto-Comacho,* 58 F.3d 408, 411 (9th Cir. 1995) (*citing United States v. Hernandez,* 739

11 F.2d 484 (9th Cir. 1984))(footnote omitted). An officer may then conduct brief questioning

12 of the occupants of a vehicle without individualized suspicion. *United States v. Villamonte-*

13 *Marquez,* 462 U.S. 579, 587 (1983)(*citing Martinez-Fuerte*, 428 U.S. at 543, 545).

14 Additionally, agents may refer a vehicle to a secondary inspection area for further

15 questioning without individualized suspicion. *United States v. Preciado-Robles*, 964 F.2d

16 882, 884 (9th Cir. 1992); *see also United States v. Sutter*, 340 F.3d 1022, 1024-27 (9th Cir.)

17 (vehicle may be referred to secondary inspection area under border search doctrine),

18 *amended by* 348 F.3d 789 (9th Cir. 2003); *Wilson,* 7 F.3d at 834 ("[b]ecause [the agent]

19 testified that referral to secondary inspection was for a further immigration inspection, and

20 because [the defendant] presents no evidence suggesting that it was not the case, the referral

21 to secondary inspection was valid even in the absence of articulable suspicion.").

22       Herein, the minimal detention of Defendant at the primary inspection area of the

23 checkpoint was narrowly limited to questions regarding citizenship, from where Defendant

24 was coming and, although inarticulately asked, if she was a member of the Tohono O'odham

25 Indian Nation. Moreover, a visual inspection of the 2002 Ford Focus did not indicate that it

26 was riding unnecessarily low, nor could BPA Romero smell any marijuana.

27       A referral to a secondary inspection area solely for drug-related concerns must be

28 based upon "an articulable suspicion or a 'minimal showing of suspicion' ... of criminal

1  activity." *United States v. Taylor*, 934 F.2d 218, 221 (9th Cir. 1991)(*quoting United States*

2  *v. Couch*, 688 F.2d 599, 604 (9th Cir. 1982)). Herein, however, based upon Defendant's

3  responses regarding the Tohono O'odham Indian Nation, along with her apparent

4  nervousness, BPA Romero directed Defendant to a secondary inspection area to continue an

5  immigration inspection.  At secondary inspection, Defendant continued to exhibit signs of

6  nervousness and was unable to provide anything more than vague directions as to where in

7  Sells Defendant's mother resided.  *See Preciado-Robles,* 964 F.2d at 884 (driver's nervous

8  demeanor during secondary inspection provided sufficient basis for pursuing immigration

9  inspection by requesting permission to search car even after driver and passenger produced

10  valid immigration documents).

11       There is a question whether BPA Romero signaled BPA Magsamen from the primary

12  or secondary inspection areas. Nonetheless, in either instance BPA Romero was not satisfied

13  that Defendant was not violating immigration laws. Consequently, a person and/or drug

14  detecting canine was utilized resulting in detection of either in the trunk area of the 2002

15  Ford Focus.

16       A detention or search conducted thereafter must be justified by either consent or

17  probable cause. *United States v. Koshnevis*, 979 F.2d 691, 695 (9th Cir. 1992)(search of

18  defendant's vehicle trunk valid at permanent immigration checkpoint by border patrol

19  because nervousness, inconsistent statements and lies provided probable cause). Herein, once

20  BPA Romero was informed by BPA Magsamen of Lando's reaction, he asked Defendant if

21  he could look in the trunk to which she agreed and handed him the key to do so. There is no

22  evidence that BPA Romero over-reached by threats, ultimatums or force to obtain

23  Defendant's consent.  Under the instant circumstances, no Fourth Amendment violation

24  occurred.

25  **III.    RECOMMENDATION**

26       For the foregoing reasons, the Magistrate Judge Recommends that the District Court

27  deny Defendant's Motion to Suppress (Doc. 16).

28       Pursuant to 28 U.S.C. §636(b), Rule 59 of the Federal Rules of Criminal Procedure,

LRCrim 12.1 and LRCiv 7.2(e), any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: **CR 11-03035-TUC-RCC.**

Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver of the right to review.

DATED this 18th day of November, 2011.

_____
Héctor C. Estrada
United States Magistrate Judge